**In the United States District Court**
**for the District of Kansas**

————————

Case No. 25-cr-40006-TC-2

————————

UNITED STATES OF AMERICA,

*Plaintiff*

v.

TRACY ANNE OAKES,

*Defendant*

————————

## MEMORANDUM AND ORDER

Tracy Anne Oakes is charged with possession of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a). Doc. 1. She moves to suppress the evidence uncovered during a traffic stop. Doc. 48. For the following reasons, that motion is denied.

## I

## A

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (recognizing incorporation against the states). Absent a recognized exception, the Fourth Amendment prohibits suspicionless seizures or warrantless searches that violate a person's objectively reasonable expectation of privacy by invading a constitutionally protected space or thing. *United States v. Jones*, 565 U.S. 400, 406 (2012); *see also United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016). Traffic stops are seizures for Fourth Amendment purposes, *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015), and in a traffic stop "a passenger is seized as well and so may challenge the constitutionality of the stop." *Brendlin v. California*, 551 U.S. 249, 251 (2007).

1

A warrantless stop is valid where the officer has reasonable suspicion to believe that a traffic violation occurred. *Kansas v. Glover*, 589 U.S. 376, 380 (2020). In particular, the officer must have "a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Salas*, 756 F.3d 1196, 1201 (10th Cir. 2014) (quotation marks omitted). The stop also must be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Morales*, 961 F.3d 1086, 1090–91 (10th Cir. 2020).

Ordinarily, the traffic stop is circumscribed by the traffic violation giving rise to the initial encounter. That means officers may conduct unrelated inquiries during a stop only if that conduct does not prolong the stop. *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). For example, it is accepted that officers may reasonably inquire as to the driver's license, automobile's registration and proof of insurance, identity of the individuals, and driver's travel plans. *United States v. Cates*, 73 F.4th 795, 806 (10th Cir. 2023) (citations omitted). But once the mission of the stop has concluded, the motorist is generally free to leave. *Morales*, 961 F.3d at 1091.

There are, of course, justifications for continued detention. For example, the driver may consent to further questioning. *United States v. Woody*, 45 F.4th 1166, 1173 (10th Cir. 2022). Or an officer may develop reasonable suspicion of other illegal activity distinct from the traffic violation. *See United States v. Munoz*, 162 F.4th 1210, 1219 (10th Cir. 2025). "To satisfy the reasonable suspicion standard, an officer need not 'rule out the possibility of innocent conduct,' or even have evidence suggesting 'a fair probability' of criminal activity." *Pettit*, 785 F.3d at 1379 (citations omitted). Instead, the officer needs only "a particularized and objective basis for suspecting criminal conduct under a totality of the circumstances." *Munoz*, 162 F.4th at 1219 (10th Cir. 2025) (quotation marks omitted); *see id.* at 1222 (finding that police developed reasonable suspicion of criminal activity after initiating a traffic stop based on the totality of the circumstances). A non-exhaustive list of factors that the Tenth Circuit has recognized as supporting reasonable suspicion include nervousness, unusual travel plans, criminal history, and travel route. *See id.* at 1220–22; *see also Pettit*, 785 F.3d at 1380–83 (holding that no one factor is determinative of reasonable suspicion of illegal activity). Accordingly, an officer who develops

reasonable suspicion of illegal activity "may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Pettit*, 785 F.3d at 1379–80 (quoting *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004)) (emphasis in original).

As a general matter, the authority to detain a motorist while investigating reasonable suspicion does not include the right to search the vehicle. Instead, a search of the vehicle must be justified by, for example, probable cause. *United States v. Phillips*, 71 F.4th 817, 823 (10th Cir. 2023); *see also United States v. Pinder*, 121 F.4th 1367, 1371 (10th Cir. 2024) (allowing contemporaneous search incident to a lawful arrest). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Phillips*, 71 F.4th at 823 (quotation marks omitted). When an officer smells drugs, such as marijuana emanating from the vehicle, that observation is "entitled to substantial weight in the probable cause analysis and can be an independently sufficient basis for probable cause." *Id.* (quotation marks omitted). Additional observations—such as nervous behavior and vague travel plans—obviously strengthen the existence of probable cause. *See Munoz*, 162 F.4th at 1220–22.

**B**

In November 2024, Junction City police department canine officer, Nicholas Blake, received a text message from a Nebraska state trooper.[1] The trooper asked Blake if he had recently pulled over a gray Hyundai Santa Fe; Blake had not. Blake then researched the Hyundai's historical license plate data and noticed that the vehicle was traveling east through Colorado. Blake noticed that the Hyundai had made a quick trip to southern California and that it had made similar trips over the past two months. Blake also learned that the Hyundai had repeatedly traveled into Canada through Rooseveltown, New York. This travel history aroused Blake's suspicion that the Hyundai might be engaged in criminal activity.

A few days later Blake saw the Hyundai exit off Interstate 70 and pull into Junction City, Kansas. He observed it give a turn signal and

---

[1] The following facts were found based on the witnesses' testimony and the evidence produced at the suppression hearing.

then immediately move one lane to the right. Believing that this was a violation of one of Kansas's many traffic laws, Blake pulled over the Hyundai. *See* Kan. Stat. Ann. § 8-1548(b) ("A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning.").

Gina Larock was driving the Hyundai and Tracy Oakes was in the passenger seat.[2] Blake approached the Hyundai and asked the women where they had been. The women did not mention that the Hyundai had made a quick trip to southern California. Instead, they replied that they had started to travel to Las Vegas but had to turn back to New York because Larock's father had died. Blake noticed that the women were extremely nervous: He testified that he could see their pulses beating in their necks. Given the women's nervousness, the fact that their answers conflicted with the license plate data, and the Hyundai's travel history, Blake immediately suspected the women of criminal activity.

Blake, having obtained Larock's license and registration, returned to his patrol car and called in Larock's information to dispatch. He then exited his patrol car and had his canine, Chera, conduct an exterior sniff of the Hyundai. Chera sniffed the Hyundai and alerted to the presence of narcotics. Blake made Chera leave the area and sniff again, and Chera then indicated to the presence of narcotics in the Hyundai.[3] Blake then called for backup and made the women exit the vehicle. He conducted a search of the vehicle, eventually locating forty-five kilograms of cocaine.

Oakes takes issue with Chera's exterior sniff of the Hyundai. As a result, it is helpful to understand the nature of Blake and Chera's relationship as well as the pair's training and certifications. Blake testified

---

[2] The driver, Gina Larock, was also indicted but has noticed her intent to plead guilty. Doc. 51; *see also* Doc. 68 (postponing Larock's change of plea hearing because of weather-related travel issues). As a result, Larock has no interest in this motion.

[3] Blake explained that Chera alerts, which he described as engaging in a natural excitedness, when she smells narcotics and indicates, which he described as a trained behavior once she has identified the strongest source of the odor, by sitting.

that he has been a canine officer for roughly sixteen years. Chera is Blake's third service dog. The pair certifies annually through the Heart of America Police Dog Association, and its most recent certification occurred in October 2024, before the stop in this case. That certification included training in the detection of narcotics like cocaine, methamphetamine, and fentanyl.

The United States indicted Oakes on one count of possession of cocaine with the intent to distribute. Doc. 1.[4] Oakes now moves to suppress. Principally, she contends that the initial stop was unlawful, that it was prolonged unlawfully, and that Chera was unreliable. Doc. 48. The Government opposes each argument. Doc. 49. An evidentiary hearing was held on March 18, where Blake testified.

## II

Blake had reasonable suspicion to stop the Hyundai. And he did not unlawfully prolong the stop with Chera, who was reliable. Accordingly, Oakes's motion is denied.

## A

Oakes first argues that the stop was unlawful at its inception.[5] Doc. 48 at 6–13. That argument fails because Blake reasonably suspected the Hyundai of violating a Kansas traffic law.

Kansas law requires that "a signal of intention to turn or move right or left . . . shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning." Kan. Stat. Ann. § 8-1548(b). And Blake credibly testified at the hearing that

---

[4] All document citations are to the document and page number assigned in the CM/ECF system.

[5] The Government conceded in its briefs and at the suppression hearing that Oakes has standing to contest the initial stop and its duration. Doc. 49 at 9 n.18; *see Armendariz v. City of Colorado Springs*, 169 F.4th 1036, 1065 n.15 (10th Cir. 2026) (declining to address Fourth Amendment standing when it was not challenged because "standing is not jurisdictional"); *see also United States v. Dewitt*, 946 F.2d 1497, 1499–500 (10th Cir. 1991) (quoting *Steagald v. United States*, 451 U.S. 204, 209 (1981)) ("[T]he issue of fourth amendment standing could be waived if the government has 'failed to raise [it] in a timely fashion during the litigation.'") (alterations in original).

he saw the Hyundai signal and then move one lane to the right without signaling properly: Blake's dashboard camera video confirms as much. Although the parties dispute the precise distance of travel before the lane change occurred, there is no dispute that it was less than the statutorily required 100 feet.[6] That evidence is sufficient to support Blake's finding of reasonable suspicion that the Hyundai violated Section 8-1548(b). *Phillips*, 71 F.4th at 823 (finding that officer's observation of the defendant committing a traffic violation was "sufficient to support the traffic stop"); *State v. Gilliland*, 490 P.3d 66, 71 (Kan. Ct. App. 2021) (finding that police had reasonable suspicion to conduct a traffic stop when the officers observed the defendant turn left without signaling).

Oakes's counterarguments are unpersuasive. She argues that the Hyundai did signal for the requisite 100 feet. Doc. 48 at 6–7. She supports that argument by extrapolating from Blake's dashboard camera and satellite imagery from Google Maps that the Hyundai signaled for 100 feet before changing lanes. *Id.* at 7 (citing Doc. 48-1). Based on the testimony and exhibits, this evidence is dubious. And, at best, it gives rise to an argument that there would be insufficient evidence to establish beyond a reasonable doubt that the Hyundai's driver violated Section 8-1548(b). But establishing guilt beyond a reasonable doubt is not the inquiry for purposes of reasonable suspicion: The pertinent inquiry is whether Blake had an objectively reasonable basis to *suspect* that the Hyundai failed to signal as required. *See United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) ("[R]easonable suspicion may rely on information less reliable than that required to show probable cause, and it need not be correct.") (citation omitted). Blake's testimony established that he had such a basis.

Oakes also argues that the stop was unlawful because Section 8-1548(b) does not require a signal when changing lanes. Doc. 48 at 7. Section 8-1548 reads as follows:

---

[6] Blake testified that he initially observed the Hyundai signal for roughly thirty-eight feet before making a lane change. He further testified that he returned to the scene of the traffic top after the stop to precisely measure the distance that the Hyundai had signaled and determined that the signal was given for roughly fifty-three feet. Whether the Hyundai signaled for thirty-eight or fifty-three feet is ultimately immaterial because there is no credible evidence that it signaled for at least 100 feet as the statute requires.

> (a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety, nor without giving an appropriate signal in the manner hereinafter provided.
>
> (b) A signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle *before turning.*
>
> . . .

Kan. Stat. Ann. § 8-1548 (emphasis added). In Oakes's view, the last two words of the statute—before turning—mean that the statute requires a signal only when turning and not when moving right or left. *See* Doc. 48 at 8 (noting that the Section 8-1548(b) rule "expressly references *only* 'turning' *and not* 'moving right or left.'") (emphasis in original).

This argument is unpersuasive because there is a definitive construction of the statute to the contrary. The Kansas Supreme Court has expressly recognized that "K.S.A. 8–1548 requires a lane change signal within 100 feet of the point where the vehicle makes the lane change . . . ." *State v. DeMarco*, 952 P.2d 1276, 1281 (Kan. 1998). That conclusion, standing alone, is sufficient to reject the creative construction offered by Oakes. *See Munoz*, 162 F.4th at 1219 ("[I]t is axiomatic that state courts are the final arbiters of state law."). Indeed, at least three district courts in Kansas have rejected the construction Oakes offers. *United States v. Morales*, 115 F. Supp. 3d 1291, 1296 (D. Kan. 2015); *United States v. Ortega*, 379 F. Supp. 2d 1177, 1183 (D. Kan. 2005); *Lewis v. City of Topeka, Kansas*, 305 F. Supp. 2d 1209, 1214 (D. Kan. 2004).

But even if this were an open question, Oakes's construction is illogical in that it excises or ignores the phrase "to turn *or move right or left*" from the statute. That is not how statutory construction works. *See* Antonin Scalia and Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 180 (2012) ("The provisions of a text should be interpreted in a way that renders them compatible, not contradictory."). As recognized by *DeMarco*, Section 8-1548(b) is best interpreted as setting out that "[a] signal of intention to turn or move right or left when required shall be given continuously during not less than the last one hundred (100) feet traveled by the vehicle before turning [or moving right or left]." Kan. Stat. Ann. § 8-1548(b). Oakes cites no authority to the

contrary or a basis to believe her position is sound. *See Burrell v. Armijo*, 603 F.3d 825, 835 (10th Cir. 2010) (citing *United States v. Kunzman*, 54 F.3d 1522, 1534 (10th Cir.1995)) (noting that "issues nominally raised but inadequately briefed need not be considered").

Finaly, Oakes submitted a notice of supplemental authority several weeks after the hearing. Doc. 69. In essence, she argues that an un-published Kansas Court of Appeals decision found that Blake lacked an objectively reasonable basis to believe the motorist violated Section 8-1548, and that it follows in this case, too, that the traffic stop was unlawful at its inception. *Id.* at 1 (invoking *State v. Flint*, 2019 WL 4123075 (Kan. Ct. App. 2019)). That argument fails for a variety of reasons.

For one, it is untimely. Supplemental briefing is for pertinent and significant authorities that could not have been found when the origi-nal brief was filed. *See* D. Kan. R. CR1.3(c) (noting that notices must "state reasons for the supplemental citations"). It is not an avenue or an invitation to submit new arguments or authorities that could have and should have been raised earlier. *United States v. Romero*, 132 F.4th 1208, 1220 n.4 (10th Cir. 2025), *cert. denied*, 146 S. Ct. 176 (2025). If Oakes wanted to make that argument, the time in which to do so was in her initial brief so that the Government could have responded to it and the issue could have been addressed at the hearing. Her failure to do so inhibited the adversarial process and prevented the parties from meaningfully addressing that argument.

For another, *Flint* is inapposite. In *Flint*, the Kansas Court of Ap-peals reversed the district court's denial of a motion to suppress be-cause, to the Kansas Court of Appeals, it was clear from Blake's dash-cam video that Flint had signaled properly. *Flint*, 2019 WL 4123075, at *4 (reversing district court's conclusion to the contrary based on its review of the dashcam video). Whatever may be said of the Kansas Court of Appeals' analysis in *Flint* seven years ago, it matters not to the evidence presented by the parties in this case at the hearing. As noted, the video confirms Blake's testimony that it was objectively reasonable for an officer on the scene to suspect that the Hyundai changed lanes without signaling for 100 feet.

**B**

Oakes also argues that suppression is required because Blake un-reasonably extended the stop. Doc. 48 at 13 (invoking *Rodriguez v.*

*United States*, 575 U.S. 348 (2015)). She contends that Blake deviated from his traffic mission when he deployed Chera immediately after calling Larock's information to dispatch. *Id.* at 14. That argument fails because Blake had reasonable suspicion to believe Oakes was engaged in drug trafficking.

As noted, a traffic stop constitutes a Fourth Amendment seizure and, as a result, must be reasonable. *United States v. Baker*, 108 F.4th 1241, 1246 (10th Cir. 2024). This means that it must be "justified at its inception and . . . the officer's actions during the stop must be reasonably related in scope to 'the mission of the stop itself.'" *Id.* (quoting *United States v. Mayville*, 955 F.3d 825, 829 (10th Cir. 2020)). In *Rodriguez*, the Supreme Court held that a traffic stop "becomes unlawful if it is prolonged beyond the time reasonably required to complete" it. *Baker*, 108 F.4th at 1246–47 (citing *Rodriguez*, 575 U.S. at 350–51) (citations omitted). And while there is no de minimis exception to the rule, *Mayville*, 955 F.3d at 830, the question is only whether "police diligently pursued the [traffic] investigation," *Rodriguez*, 575 U.S. at 354, and not whether they took the quickest route humanly possible to concluding the stop. *Mayville*, 955 F.3d at 827. Thus, courts are not permitted to "second-guess the logistical decisions of officers so long as their actions were reasonable and diligently completed within the confines of a lawful traffic stop[ ] . . . because reasonableness—rather than efficiency—is the touchstone of the Fourth Amendment." *Id.*

The Tenth Circuit has established a three-part test for analyzing the lawfulness of a delay under *Rodriguez*. In particular, an unlawful seizure occurs when an officer diverts from the traffic-based mission of the stop to investigate ordinary criminal conduct, does so in a way that "prolongs" (i.e., adds time to) the stop, and the investigative detour is unsupported by any independent reasonable suspicion. *Baker*, 108 F.4th at 1248. That means "the government prevails if the officers' actions did not divert from the traffic mission, the search was not prolonged, or reasonable suspicion existed." *Id.* In other words, an officer's conduct does not offend the Fourth Amendment if he or she has, at a minimum, reasonable suspicion of criminal wrongdoing. *Id.* at 1247 (citing *Mayville*, 955 F.3d at 830).

Blake did not unlawfully prolong the stop because, based on the totality of circumstances, he reasonably suspected that the Hyundai was engaged in criminal activity. *Contra* Doc. 48 at 13. In particular, the Hyundai had made a quick roundtrip to California. Blake testified that in his experience only drug couriers make such trips, and that he had

been personally involved in approximately thirty seizures of drugs from individuals who had made such trips. That training and experience is entitled to deference. *United States v. Cortez*, 449 U.S. 411, 419 (1981) ("[W]hen used by trained law enforcement officers, objective facts, meaningless to the untrained, can be combined with permissible deductions from such facts to form a legitimate basis for suspicion of a particular person and for action on that suspicion."). Blake further testified that where, as here, the vehicle had made repeated and quick long-distance trips, it was "almost certain" that the vehicle was involved in criminal activity. Again, courts have historically credited such observations. *See United States v. Hayes*, 62 F.4th 1271, 1279 (10th Cir. 2023) (finding that police reasonably suspected the defendant of drug trafficking when he had, among other things, "made multiple short trips between [two distant cities]"); *accord United States v. Batara-Molina*, 60 F.4th 1251, 1257 (10th Cir. 2023) ("To make such a long trip—only to stay at the destination for such a short amount of time—is also consistent with the behavior of a drug courier."); *Pettit*, 785 F.3d at 1381 ("We have consistently held that implausible travel plans can contribute to reasonable suspicion.") (alterations omitted).

Moreover, Blake testified that Oakes and Larock were extremely nervous and that he could see their pulses in their carotid arteries. This too served as a basis for reasonable suspicion. *See Pettit*, 785 F.3d at 1383 (finding that "abnormal nervousness" contributed to reasonable suspicion).

Finally, Oakes and Larock lied about their travel plans. As noted, they claimed that they were intending to go to Las Vegas, but stopped short due to a family emergency and turned around before arriving there. But Blake knew the vehicle in which they were driving had been west of Las Vegas in southern California. This, too, further aroused Blake's suspicion. *Cf. United States v. Simpson*, 609 F.3d 1140, 1152 (10th Cir. 2010) (finding that evasiveness about travel plans contributed to reasonable suspicion).

It may be true that just one of these facts, in isolation, would be insufficient to support a probable cause determination. *See Munoz*, 162 F.4th at 1219 (noting that the reasonable suspicion analysis "precludes a divide-and-conquer analysis, where the court views each factor that would support reasonable suspicion in isolation"). And to be sure, there are a host of lawful explanations for Oakes's conduct. But "the existence of a plausible innocent explanation does not preclude a finding of reasonable suspicion." *Id.* at 1220. The combination of these

factors gave Blake reasonable suspicion that criminal activity may be afoot such that additional investigation—specifically an investigatory detention and deploying Blake's drug dog, Chera—was warranted to determine if the Hyundai was engaged in drug running. *See Baker*, 108 F.4th at 1248 (noting that an element of the *Rodriguez* test is that "the investigative detour is unsupported by any independent reasonable suspicion"); *United States v. Mercado-Garcia*, 989 F.3d 829, 838–39 (10th Cir. 2021) (finding that an officer deployed a drug dog after he had reasonable suspicion of criminal activity based on similar facts).

*United States v. Frazier*, 30 F.4th 1165 (10th Cir. 2022), does not suggest a different conclusion. *Contra* Doc. 48 at 14. In that case, the Tenth Circuit reversed the district court's denial of a motion to suppress because police did not have reasonable suspicion to deviate from the traffic mission to deploy a dog. *Frazier*, 30 F.4th at 1178. That was because the officer's reasonable suspicion analysis relied on factors that should have been disregarded by the district court because they were completely innocuous: The defendant had a duffle bag in the back seat, did not fully roll down his window when the officer approached, drove a rental car, had a driver's license from one state and an identification card from another, and he could not locate the rental agreement. *Id.*

Blake's suspicion stands in stark contrast. The women exhibited extreme nervousness, their travel plans were contradicted by the license plate data known to Blake at the time of the stop, and Blake had knowledge of the Hyundai's travel history of frequent, short-lived cross-country trips. All of these factors are indicative of reasonable suspicion. *See United States v. Baker*, 108 F.4th 1241, 1249 (10th Cir. 2024) (distinguishing *Frazier* because "the officer's action—there, spending three minutes in his car attempting to contact the K-9 handler before starting other traffic tasks—objectively had nothing to do with the traffic mission or safety during the stop").

**C**

Oakes's third line of attack is that Blake's K-9 partner, Chera, was unreliable. Doc. 48 at 16. It is established that a canine alert provides probable cause to search a vehicle. *United States v. Moore*, 795 F.3d 1224, 1231 (10th Cir. 2015). The Government must show that the dog is reliable by offering evidence that it has performed satisfactorily in a certification or training program. *Florida v. Harris*, 568 U.S. 237, 247 (2013). But the defendant must have an opportunity to contest the

dog's reliability by, for example, questioning the efficacy of its certification or training program. *Id.* District courts must weigh all the competing evidence to ultimately determine "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 248.

Chera's alert was reliable. *Contra* Doc. 48 at 16. The Government offered evidence of Chera's training and certification. In particular, Blake testified that he certifies Chera annually through the Heart of America Police Dog Association, and that she was last certified in October 2024, roughly a month before the stop. There is no evidence or meaningful argument that this organization is not respected or has certified Chera improperly. That largely dooms Oakes's claim. *See Harris*, 568 U.S. at 246–47 ("If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume . . . that the dog's alert provides probable cause to search."); *see also United States v. Beltran-Palafox*, 731 F. Supp. 2d 1126, 1156 (D. Kan. 2010) (concluding that K-9 and handler certified by Heart of America Police Dog Association was "well-certified" and reliable). But Blake also testified that he regularly performs controlled training exercises with Chera, two of which occurred in October a month before the stop. *See Harris*, 568 U.S. at 246–47 (noting that courts can presume that a dog's alert was reliable "if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs").

Oakes's counterarguments are unavailing. She first takes issue with Chera's trainings, arguing at the suppression hearing that they were inadequate because they were controlled tests where Blake, as Chera's handler, knew the location of the drugs. But the Supreme Court has explained that controlled tests rather than blind tests are a better measure of a dog's ability because blind tests in the field do not capture a dog's false negatives. *Harris*, 568 U.S. at 245. And dogs may alert to a lingering or residual odor of drugs in the place to be searched even though there are no drugs present at the time the sniff and search were conducted. *Id.* at 246. "The better measure of a dog's reliability thus comes away from the field, in controlled testing environments." *Id.*; *accord Beltran-Palafox*, 731 F. Supp. 2d at 1157 (noting that "the controlled testing environment is the best way to measure a drug dog's reliability").

Oakes also argues that Blake improperly cued Chera by having her rework the area where she alerted until she indicated. Doc. 48 at 18; *see Harris*, 568 U.S. at 247 (noting that probable cause may be undermined "if, say, the officer cued the dog"). As an initial matter, Blake had probable cause to search the Hyundai as soon as Chera alerted to the presence of narcotics. *See Moore*, 795 F.3d at 1232 ("We have held that an alert, or a change in a dog's behavior in reaction to the odor of drugs, is sufficient to establish probable cause to search a vehicle, and that a final indication is not necessary."); *see also United States v. Parada*, 577 F.3d 1275, 1282 (10th Cir. 2009) ("We decline to adopt the stricter rule urged by [the defendant], which would require the dog to give a final indication before probable cause is established."). But in any event, the evidence offered at the suppression hearing does not show that Blake cued Chera, impermissibly or otherwise. *Contra* Doc. 48 at 18. Blake, a dog handler with over a decade of experience and on his third K-9 partner, credibly testified that Chera provides two types of signals: an "alert" when she smells narcotics and an "indication" when she has locates the strongest source of the narcotics' scent. He explained that Chera first alerted to the presence of narcotics, so he had her leave the area and sniff again to confirm the alert and get a more precise indication of where the narcotics were located. He then testified, without contrary evidence, that it is common for a dog to rework an area in order to sharpen an alert into an indication. There is no evidence that Chera's alert and indication were anything other than her discovery of the forty-five kilograms of cocaine in the Hyundai.

## D

Finally, Oakes argues that Blake's use of the Hyundai's historical license plate data violated her Fourth Amendment rights. Doc. 48 at 20. Relying on *Carpenter v. United States*, 585 U.S. 296 (2018), she argues that Blake's "database-driven, long-horizon reconstruction" of her movements brings this case within *Carpenter*'s ambit. *Id.* at 22–23. Not so.

As an initial matter, Oakes has made no argument that she had a subjective expectation of privacy in the Hyundai's license plate that society was prepared to recognize as reasonable. *See Carpenter*, 585 U.S. at 304 ("When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, we have held that official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause.") (quotation marks omitted).

13

And it is difficult to see how she or any other motorist could do so in light of existing precedent. The Supreme Court has recognized that "[a] person traveling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *United States v. Knotts*, 460 U.S. 276, 281 (1983). Indeed, the Tenth Circuit has held that one does not have a privacy interest in a license plate, which is by its nature in the public view. *United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989); *see also New York v. Class*, 475 U.S. 106, 114 (1986) ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile."). And recently the Fifth Circuit rejected the very argument that Oakes makes in this case, noting that there is no privacy interest in a license plate number and that license plate readers are outside *Carpenter*'s reach. *United States v. Porter*, 170 F.4th 381, 387 (5th Cir. 2026). Oakes cites no authority to the contrary.

## III

For the foregoing reasons, Oakes's Motion to Suppress, Doc. 48, is DENIED.

It is so ordered.

Date: April 15, 2026                    s/ Toby Crouse
                                        Toby Crouse
                                        United States District Judge